UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

TAMARA K. HIGGS,                                    Civil No. 09-3337 (RHK/FLN)

                Plaintiff,

v.

MICHAEL J. ASTRUE,                          **REPORT AND RECOMMENDATION**
Commissioner of Social Security,

                Defendant.

_____

Fay E. Fishman, for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for Defendant.
_____

    Plaintiff Tamara K. Higgs ("Ms. Higgs") seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner"), who awarded her disability benefits beginning

on January 1, 2006, but denied disability benefits from November 1, 2004 to December 31, 2005.

The matter was referred to the undersigned United States Magistrate Judge for Report and

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over

the claim pursuant to 42 U.S.C. § 405(g). The parties have submitted cross motions for summary

judgment. (ECF Nos. 6, 9.) For the reasons which follow, it is this Court's recommendation that

the Commissioner's decision be **AFFIRMED** and the case be **DISMISSED WITH PREJUDICE.**

**I. INTRODUCTION**

    The issue on appeal before this Court is whether Ms. Higgs is entitled to disability benefits

for the time period of November 1, 2004 to December 31, 2005.

    Ms. Higgs filed an application for disability benefits on September 14, 2005, alleging

disability as of November 1, 2004. (Administrative Record [hereinafter "R."] 103, ECF No. 4.) The

Social Security Administration ("SSA") initially denied her application on December 28, 2005, stating that Ms. Higgs' condition was not severe enough to keep her from working her past job as a sales person. (R. 59.) Upon reconsideration, her application was again denied on March 20, 2006. At that time, the SSA concluded that Ms. Higgs' condition kept her from performing her past work as a sales person, but that her condition was not so severe as to keep her from doing other, less physically demanding work. (R. 61.)

Pursuant to an administrative hearing on August 21, 2007, the Administrative Law Judge, Diane Townsend-Anderson ("ALJ") concluded that, from November 1, 2004 through December 31, 2005, Ms. Higgs was not disabled within the meaning of the Social Security Act. (R. 19.) The ALJ based her decision on her finding that Ms. Higgs' subjective complaints regarding the severity of her symptoms between November 1, 2004 and December 31, 2005 were not entirely credible, and her ultimate determination that Ms. Higgs had the residual functional capacity ("RFC") to perform sedentary work in the national economy during that time period. (R. 17-19.) The ALJ found, however, that Ms. Higgs became disabled on January 1, 2006, as her subjective complaints regarding the severity of her symptoms at that time were generally credible, and no significant number of jobs in the national economy exist which would allow her three or four necessary absences per month. (R. 18-19.)

On September 25, 2009, the Appeals Council denied Ms. Higgs' request for review, rendering the ALJ's decision final for purposes of judicial review. (R. 1-4); *see* 20 C.F.R. § 404.981. Ms. Higgs commenced this civil action on November 23, 2009, pursuant to 42 U.S.C. §§ 205(g), and 405(g) of the Social Security Act. (ECF No. 1.) The Commissioner filed his Answer on January 26, 2010. (ECF No. 3.) Ms. Higgs and the Commissioner have both moved for summary

judgment. (ECF Nos. 6, 9.)

## II. STATEMENT OF FACTS

### A.    Background

Ms. Higgs was born on July 4, 1959.  (R. 58.)  She was 46 years old when she filed an application for Disability Insurance Benefits on September 14, 2005.  (R. 58, 103.)  She was 48 years old at the time of the administrative hearing before the ALJ on August 21, 2007.  *Id.*  Ms. Higgs claims the date she was first unable to work was November 1, 2004, and that she should be awarded disability benefits from that date onward.  (R. 118.)  Ms. Higgs suffers from chronic neck and upper back pain and a degenerative disc disorder.  (R. 25, 60, 197.)  She has completed two years of a college education in general studies.  (R. 24, 129.)  She has past relevant work experience as a sales person in carpeting, technology, and network marketing.  (R. 27-28, 84.)

On November 1, 2004, Ms. Higgs was working for Column Engineering in retail technology sales and consulting.  (R. 119, 201.)  She claims that, beginning on that date, she could no longer perform her job duties because she could not concentrate, had limited mobility, and could not drive.  (R. 118.)  It is undisputed that Ms. Higgs was unable to continue her work in sales and consulting as of November 2004, and she officially left her position with Column Engineering on November 31, 2004.  (R. 27-28, 30, 202.)  It is not clear, however, that she was unable to work at all on that date.  (R. 27-28, 30, 110.)  The record shows she worked in some capacity, earned income, volunteered, and went on vacation through December 2005.  *Id.*

Ms. Higgs asserts that, from November 1, 2004 to the present,  she has been in extreme pain, has had limited mobility, and has not been able to drive.  (R. 118, 136-37.)  Still, although Ms. Higgs had difficulty concentrating and sitting, she was able to walk, stand, and write prior to 2006. (R.

3

132-33.)

Ms. Higgs resides with her husband, Roland Higgs. (R. 24.) Currently, her husband is responsible for the all of the housework and preparing meals, while Ms. Higgs needs continuous rest and is active only one or two hours per day. (R. 31, 178.)

### B. Medical Evidence - Physical Impairments

Ms. Higgs suffers from chronic neck and back pain, primarily between the shoulder blades and up to the base of her neck. (R. 25, 60.) Ms. Higgs has suffered from neck discomfort for a number of years. In 1998, she underwent an anterior cervical fusion; in 1999 she underwent revision surgery because a non-union developed as a result of the first surgery; and in November 2002 she underwent a right C6-7 hemi-laminectomy and foraminotomy to correct right arm pain. (R. 474.)

In February 2003, only a few months after her third back surgery, Ms. Higgs was rear-ended in a car accident. (R. 26, 29.) This accident worsened her previous back and neck discomfort and served as the catalyst for the pain at issue in this case. *Id.* The accident also caused intermittent right hand numbness. (R. 279.) Ms. Higgs has since undergone additional multiple cervical fusion surgeries to alleviate her pain, all of which have affected the motion, support, and curve of her spine. (R. 29, 160.)

The first surgery after the accident was performed in July 2004. (R. 172, 195.) She was authorized to go back to work in September 2004, at which time she worked from home. (R. 195.) In October 2004, a CT scan revealed that her most recent fusion did not take, and Ms. Higgs was placed on medical leave for 60 days. (R. 195, 202.) Ms. Higgs continued to work sporadically through the end November of 2004, after which she permanently stopped working. (R. 16, 27, 30.)

Ms. Higgs underwent another surgery in February 2005, after which the fusion finally

adhered, although the pain did not subside. (R. 195, 202.) She visited United Pain Center on September 22, 2005 for some additional pain relief so that she could enjoy herself on an upcoming vacation. (R. 362.) Although she was still in some pain, Ms. Higgs continued to drive in December 2005 and continued to use her home computer. (R. 376, 378.) In 2007, Ms. Higgs was diagnosed with degenerative disc disorder, and a pain pump was implanted. (R. 197.) Ms. Higgs has also received injections for her pain. (R. 162-63.)

Medical records also include evidence of high blood pressure, and some thyroid issues in 2003 and 2004. (R. 251, 253-54.) Ms. Higgs has also been diagnosed with sleep apnea. (R. 249.)

### C.    Medical Evidence - Mental Impairments

Ms. Higgs takes multiple pain medications and is on pain patches. (R. 29.) Her pain has resulted in restless nights and fatigue. (R. 38.) She has been diagnosed with mild depression due to her chronic back pain. (R. 33, 257.) Since January 2004, she has sporadically taken anti-depressants to assist her with sleeping and with bouts of crying. (R. 33, 230, 257, 366.) In July 2005, Ms. Higgs acknowledged having mild depression as a result of her pain, but declined to treat it with an anti-depressant at that time. (*See* R. 364.) As of September 2005, Ms. Higgs had difficulty concentrating and sitting, but was otherwise able to move. (R. 132-33.) In May 2006, she began seeing John Cronin, a psychologist, who diagnosed her with a dysthymic disorder and a pain disorder, "associated with both psychological factors and a general medical condition." (R. 553-54.) She was prescribed antidepressants, including Effexor and Cymbalta in 2006. (*See e.g.* R. 549, 744.) In 2007, she was prescribed Valium for anxiety, and Ambien for sleep, but, overall, her depression remained mild. (R. 199-200.)

### D.    Claimant's Testimony

At the administrative hearing on August 21, 2007, Ms. Higgs testified regarding her background and conditions. (R. 24.) She testified that she lived with her husband and that she suffered constant pain between her shoulder blades and up to her neck, which she treated with medication. (R. 24, 29.) She testified that she completed two years of a college education in general studies. (R. 24.) For the last 15 years, Ms. Higgs worked in technology sales, which included software and hardware product sales and consulting.[1] (R. 40.) Her sales activities consisted of computer use, paperwork, presentations, and driving to and from client meetings. (R. 40-41.) She testified that, as of Christmas 2004, she was still working in technology sales, but was unable to call on clients because of the severity of her pain. (R. 27-28, 30.) In addition to her technical sales position, Ms. Higgs sporadically worked from home in "network marketing," selling nutritional and skin care products for six to eight hours per month. (R. 27-28.) She stopped working in that position in December 2004, as she was unable to meet with new enrollees in her nutritional and skin care sales business due to her pain. (R. 28.)

The record shows that Ms. Higgs' earnings equaled $42,538.60 in 2004, and $10,211.80 in 2005. (R. 110.) She attributed her earnings in 2005 to commissions earned prior to November 1, 2004 from both her technical and network marketing sales jobs. (R. 27.) Ms. Higgs' employers (Column Engineering and Global Lifestyles) confirmed that income reported as earned in 2005 resulted from sales performed in 2004. (R. 212, 214.)

At the hearing, the ALJ asked Ms. Higgs if she had "looked for any full-time work or work for cash" since discontinuing her two sales jobs at the end of 2004. (R. 28.) Ms. Higgs answered that she "did work" by volunteering with the association board of her townhouse (R. 28.) After her

---

[1] At some point during this 15-year period, Ms. Higgs was laid-off temporarily from her technology sales position and worked part-time selling carpet for her family's business. (R. 40.)

fifth and final fusion surgery, her pain made it difficult drive, and she stopped driving in February 2005. (*See* R. 26.) She continued to volunteer with her townhouse association, however, through March 2007. (R. 28-29.)

Ms. Higgs also stated that her pain affected her ability to do everyday activities, like housework. (R. 32.) Her husband cleans their home and makes most of her meals. (R. 31-32.) While she used to be very active, she has since stopped nearly all activity due to pain. (R. 33.) She testified that, socially, she and her husband occasionally have friends over to their home for dinner or go to their friends' homes for dinner, but that she does not venture out where people would not understand that she may have to leave suddenly because of pain. (R. 34.)

Ms. Higgs further acknowledged that she has tried many different anti-depressants to treat her case of mild depression. (R. 33.) She asserted that she found it difficult to concentrate and read. (R. 35.) She also testified that she was unable to remember things from prior days, and tends to forget what she has done and said. (R. 35.)

E.    **Third-Party Statements**

On November 3, 2005, Ms. Higgs' husband, Roland Higgs, completed a Social Security Administration Third Party Function Report. (R. 135.) Mr. Higgs reported that Ms. Higgs cared for her own personal needs with some pain, and that occasionally she needed to be reminded to take medications. (R. 136-37.) Mr. Higgs stated that Ms. Higgs prepared breakfast but rarely prepared any large meals, and that she only did the laundry and no other household chores. (R. 136-37.) Mr. Higgs also reported that, in November 2005, Ms. Higgs usually only traveled to doctors' appointments, and that she drove for short periods of time. (R. 135, 138.) He stated that she lives with constant and debilitating pain and that her condition has radically altered their lives and

relationship.  (R. 142.)

**F.     Medical Experts' Statements**

**1. United Pain Center**

**a. November 1, 2004 through December 31, 2005**

Ms. Higgs began receiving treatment from Dr. Edrie J. Kioski and nurse practitioner Una Edwardson at the United Pain Center on April 23, 2004.  (R. 355- 406.)  Throughout the time period at issue (November 1, 2004 to December 31, 2005), Ms. Higgs continued to have regular appointments with Dr. Kioski and Ms. Edwardson related to her pain.  On January 13, 2005, Ms. Higgs was seen by Ms. Edwardson as a follow up to her cervical fusion surgery (performed by Dr. Kraker) of July 8, 2004.  (R. 376.)  At this appointment, Ms. Higgs stated that she was staying positive and "telling [herself] that [she was] doing better" and that the stress from her job "had been tremendous" but that things were "much better."  *Id.*  She was doing some work from her home computer and wanted to return to work in sales as soon as Dr. Kraker thought it was "reasonable for her." *Id.*

On February 14, 2005, Ms. Higgs visited Dr. Kioski to follow up on her chronic neck pain. (R. 374.)  Although she exhibited "no pain behaviors," Ms. Higgs reported her pain rating to be an eight out of ten and was wearing a neck brace, which limited her neck motion. *Id.*  Dr. Kioski prescribed pain patches and refilled her prescription for a narcotic pain medication.  (R. 375.)

On May 25, 2005, Ms. Higgs returned to Ms. Edwardson for a visit related to her chronic neck pain.  (R. 367.)  Ms. Higgs was frustrated with the pain and mentioned that she has started to investigate Social Security Disability since she had not had any income since January 2005.  *Id.* Despite the recent increase in narcotics, Ms. Higgs complained that her pain had not decreased.  (R.

368-69.)

On September 22, 2005, Ms. Higgs returned to Ms. Edwardson at the United Pain Center. (R. 363.) The purpose of her visit was to request a quick relief of her neck pain so that she could enjoy her out of town vacation on September 28, 2005. (R. 362.) The nurse was only able to provide Ms. Higgs with refills of her pain medication at that time. (R. 363.)

On October 24, 2005, Ms. Higgs had a follow up appointment for her chronic neck pain with Dr. Kioski. (R. 358.) At this appointment, Dr. Kioski prescribed additional pain medications. (R. 359.) Again, Ms. Higgs expressed an interest in applying for Social Security Disability. (R. 359.) Dr. Kioski told her that it would be best if she continued working and would not support her in a disability assessment. *Id.*

On December 22, 2005, Ms. Higgs visited Ms. Edwardson at the United Pain Center for another appointment related to her chronic neck pain. (R. 424-25.) She reported that she was very happy with the therapy treatment she was receiving from Dr. Agre (her physical therapist) and that motion in her neck was improving. *Id.* Ms. Higgs reported to Ms. Edwardson that she had applied for Social Security Disability, and stated that her goal was "to be able to at least have some temporary income until she [could] figure out a job/career that would be acceptable to her underlying condition." (R. 424.) On that date, Ms. Edwardson reported that Ms. Higgs "looked wonderful . . . appear[ed] to have lost weight and toned up considerably." *Id.* She noted that Ms. Higgs had "markedly improved range of motion in her neck" and that "she also appeared to be markedly upbeat, less labile emotionally," and felt that, overall, she was "gaining ground." *Id.*

### b. After January 1, 2006

During an appointment with Dr. Kioski on January 23, 2006, Ms. Higgs stated that her

therapy with Dr. Agre no longer helped her pain, in contrast to her statements of December 22, 2005, in which she mentioned that her condition was improving. (R. 422, 424.)

## 2. Advanced Spine Associates, P.A. - Dr. David P. Kraker

### a. November 1, 2004 through December 31, 2005

Surgeon, Dr. David Kraker, first treated Ms. Higgs on May 21, 2004 and diagnosed her with mild disc degeneration at cervical C7-T1 and advanced disc degeneration at cervical C3-4 and C4-5. (R. 279-81, 474.) On July 8, 2004, Dr. Kraker performed an anterior discectomy on Ms. Higgs. (R. 241-42.) On September 3, 2004, he determined that Ms. Higgs should return to work. (R. 284.) This determination was based on Ms. Higgs' representation that using a computer did not aggravate her pain. *Id.* At that time, she was working in technical sales and network marketing. *Id.*

On November 3, 2004, Dr. Kraker determined that Ms. Higgs' pain and symptoms had returned. (R. 285.) He recommended that she wear her hard neck collar at all times and prescribed a bone stimulator. *Id.* He also completed a Report of Workability on that date, which stated that she should not work for a duration of three months (until February 2005). (R. 305.) Ms. Higgs had a follow up visit on February 11, 2005. (R. 286.) Dr. Kraker recommended a CT scan and another surgical fusion. *Id.* He completed another Report of Workability, stating that she should not work for another two months (April 2005). (R. 304.) After the fusion surgery on February 28, 2005, Ms. Higgs returned to Dr. Kraker for a check up on March 23, 2005. (R. 287.) He noted that she was improving symptomatically and was weaning off her pain medication and her cervical collar. *Id.* As initially recommended in the Report of Workability dated February 11, 2005, he confirmed that she should remain off work until April 2005. *Id.*

During a follow up visit on May 27, 2005, and again at her final appointment with Dr.

Kraker on August 26, 2005, Ms. Higgs complained of continued right side scapular pain and spasms. (R. 288-89.) Dr. Kraker stated that "there was nothing further [he] could offer her" and referred her to Dr. Herard for therapy. *Id.* At her final appointment, Dr. Kraker did not comment as to whether or not Ms. Higgs should be working, but did state that she could stop using her bone stimulator. *Id.* Ms. Higgs only complained of tenderness and trapezial spasms at that time. *Id.*

### b. After January 1, 2006

August 26, 2005 was the last date that Dr. Kraker treated Ms. Higgs. (R. 477.) On January 22, 2006, he received a letter from Ms. Higgs informing him that she underwent radio frequency denervation, per his recommendation, from Dr. Lon Lutz. *Id.* Based on this letter, Dr. Kraker reported, on February 20, 2006, that "as of January 22, 2006, [Ms. Higgs] has not been able to return to work and she has informed [sic] she has filed for Social Security Disability. She does have difficulty sitting up for long periods of time and must lie down frequently during the day. This does limit her ability to work." *Id.* He could not comment, however, on her then-present physical limitations or her reaction to the radio frequency denervation therapy. (R. 478.)

### 3. Chiropractor - Kathleen Bloom

### a. November 1, 2004 through December 31, 2005

Kathleen Bloom treated Ms. Higgs from at least December 2004 through August 2005. (R. 266-72.) Ms. Bloom's records indicate that Ms. Higgs has had a slow recovery as a result of the 2003 car accident, and that Ms. Higgs had a permanent impairment of the cervical and thoracic spine due to the accident. (R. 271.) Additionally, Ms. Bloom stated that Ms. Higgs had restrictions as a result of her pain. *Id.* Due to these restrictions, Ms. Bloom reported that Ms. Higgs was "unable to work" in December 2004, but that eventually Ms. Higgs would be able to participate in an active

exercise program to strengthen the area damaged by the accident.  *Id.*  Ms. Bloom did not specifically opine on Ms. Higgs' capacity to eventually return to work.

In July of 2005, Ms. Bloom reported that Ms. Higgs' thoracic region suffered from spasms and tenderness.  (R. 267-68.)  At an appointment on July 25, 2005, Ms. Higgs reported her pain rating as an eight out of ten and that her symptoms were worse and constant.  (R. 267.)

### b. January 1, 2006 to Present

There is no evidence in the record that Ms. Bloom treated Ms. Higgs after August 2005.

### 4. Dr. Bradley Helms

#### a. November 1, 2004 through December 31, 2005

In August 2005, Dr. Kioski referred Ms. Higgs to Dr. Bradley Helms (a specialist in physical medicine and rehabilitation) regarding her chronic neck pain.  (R. 276.)  On August 1, 2005, Ms. Higgs met with Dr. Helms and complained of pain, not in the areas of her surgeries, but in the thoracic areas, which Dr. Helms thought was "interesting."  *Id.*  Dr. Helms physically examined Ms. Higgs and gave her a CT scan.  (R. 277-78.)  He then referred her to Dr. Mark Agre for prolotherapy (a series of injections to specifically target ligamental structures in and around the bones).  (R. 274, 278.)

#### b. January 1, 2006 to Present

There is no evidence in the record of Dr. Helms treatment after January 1, 2006.

### 5. IMPACT Physical Medicine and Aquatic Center - Dr. Mark Agre

#### a. November 1, 2004 through December 31, 2005

Dr. Mark Agre of IMPACT Physical Medicine and Aquatic Center, placed Ms. Higgs on an active prolotherapy routine.  (R. 321-22.)  On August 22, 2005, Dr. Agre reported that Ms. Higgs'

pain level and condition were such that, in his opinion, she was "welcome to and could return to work as a salesperson." (R. 319.) He examined the areas where Ms. Higgs reported pain (which were not the areas subject to her surgeries) and found no degenerative changes or herniations. *Id.* On November 10, 2005, after 10 sessions of the high-level therapy, postual restoration, and an active exercised-based program, Dr. Agre noted that he was "definitely seeing improvements." (R. 326, 330.)

### b. After January 1, 2006

On April 14, 2006, Dr. Agre reported that Ms. Higgs had "completed her current occupational therapy/postual restoration" because it had aggravated her pain considerably. (R. 490, 493.)

On November 17, 2006, Dr. Agre reported that Ms. Higgs could "do some light sedentary work, [but] only for a brief episodic length time, perhaps a couple of hours" and that the impairments due to her pain were "permanent." (R. 488.) In his November 17, 2006 report, Dr. Agre stated that, within a reasonable degree of medical certainty, Ms. Higgs was "permanently and totally disabled from substantial competitive gainful employment." (R. 489.) In his Physical Residual Functional Capacity Questionnaire, dated December 6, 2006, he stated that Ms. Higgs could not tolerate any stress in the workplace, that she could sit or stand less than two hours in an eight hour work day, and that she would need to take unscheduled breaks throughout the eight hour work day. (R. 606.)

### 6. Medical Evaluations, Inc. - Dr. Michael Davis

### a. November 1, 2004 through December 31, 2005

On August 24, 2005, Dr. Michael Davis, an independent medical examiner, reviewed Ms.

Higgs' medical history, employment history, and present symptoms. (R. 652-61.) He also conducted a physical examination of Ms. Higgs. (R. 656-57.) In his report, Dr. Davis concluded that Ms. Higgs had a "permanent disability . . . to the cervical spine," and that she should "avoid repetitive bending, repetitive twisting, overhead work with her hands, and heavy lifting." (R. 661.)

### b. January 1, 2006 to Present

Dr. Davis only examined Ms. Higgs once, on August 24, 2005.

### 7. State Agency Assessments

### a. November 1, 2004 through December 31, 2005

On December 22, 2005, Ms. Higgs was evaluated by state agency medical consultant, Dr. James Stevenson. (R. 407.) In his Physical Residual Functional Capacity Assessment, Dr. Stevenson concluded that Ms. Higgs could occasionally lift and carry 10 pounds, frequently lift and carry less than 10 pounds, stand or walk at least 2 hours, sit a total of 6 hours in an 8 hour work day, and was limited in pushing or pulling due to her neck pain. (R. 408.) He also found that Ms. Higgs could frequently climb stairs, balance, kneel, crouch, and crawl, and could perform sedentary work with limited use of her extremities. (R. 409-14.)

### b. January 1, 2006 to Present

A second state agency medical consultant, Dr. Greg Salmi, completed a Request for State Agency Consultant Advice on March 12, 2006. (R. 479.) He reviewed all of the evidence in the file to date, which included Ms. Higgs' history of her five surgeries, her recent pain injections, and Dr. Stevenson's report of December 2005. (R. 480.) Based on this review, Dr. Salmi "affirmed" Dr. Stevenson's report, which stated that Ms. Higgs could perform minimal sedentary work. *Id.*

### 8. Primary Behavioral Health Clinics, Inc. - John Cronin, Ph.D., M.P.H.

### a. November 1, 2004 to December 31, 2005

The record indicates that Ms. Higgs did not see Dr. Cronin prior to May 2006.

### b. January 1, 2006 to Present

On May 1, 2006, Ms. Higgs began to see Dr. Cronin, a licensed psychologist. (R. 548.) On December 1, 2006, Dr. Cronin concluded that Ms. Higgs was "totally disabled from gainful employment at [that] point in her life" and that, due to both her ongoing chronic pain problems and her continued "psychological/psychiatric issues," she "would not be able to meet the demands of sustained gainful employment as it exists in the United States workforce as of 2006." (R. 554.) Dr. Cronin also concluded that her everyday activities should be restricted in order to reduce stress and anxiety, and that she should refrain from any exertion. *Id.* He determined that her mental and physical limitations prohibited her from engaging in any activity beyond mild neurocognitive activities such as handling the family finances or other low stress domestic activities. *Id.*

### G. Vocational Expert's Testimony

Ms. Juletta M. Herren testified at the August 21, 2007 administrative hearing as a vocational expert. (R. 47.) The ALJ posed three hypothetical questions for Ms. Herren to consider. First, the ALJ asked Ms. Herren to consider an individual in the age range of 45-48 years, who has more than a high school education, and who is on a number of medications with the side effects of fatigue, waking, high blood pressure, and some thyroid issues. *Id.* This individual is impaired with obesity, degenerative disk disease, status of multiple post cervical surgeries, status of post motor vehicle accident, and suffers from a pain disorder and dysthymia. *Id.* These impairments result in some limitations. This individual is limited to lifting and carrying 20 pounds occasionally, 10 pounds frequently, and can do all aspects of light work. (R. 48.) This person would be limited to work

15

where there would be no heights, ladders, scaffolding, or requirement to move the shoulders, and no reaching, pushing or pulling beyond an arm's length.  *Id.*  Furthermore, this individual would be limited to work where there would only be occasional bending, stooping, crouching, crawling, twisting, or climbing, and who, due to pain and dysthymia, would be limited to work no more than a semi-skilled position.  *Id.*  This individual also could do no work that involved repetitive rotation of the neck.  *Id.*

Ms. Herren testified that a person with these hypothetical limitations could not perform the sales work that Ms. Higgs' had previously done, but that there were three jobs – park aide, museum attendant, and financial investigator – that the individual could perform. (R. 48-50.)  All of these positions fall under the general clerical occupational category of which there were 38,000 total jobs available, and 19,000 jobs available in each category.  (R.  50.)

The ALJ then posed a revised hypothetical question. *Id.*  The ALJ asked Ms. Herren to consider an individual with the same conditions as previously mentioned, but now only able to lift and carry 10 pounds occasionally, 5 pounds frequently, and would be able to do all functional aspects of sedentary work.  (R.  50.)  Ms. Herren testified that a person with these hypothetical limitations could perform two semi-skilled sedentary jobs – information clerk and travel clerk.  (R. 50-51.)  Both of these positions would fall under the category of receptionist (of which there were 23,910 jobs available), or customer service clerk (of which there were 39,880 jobs available).  (R. 51.)  In addition, the individual could perform three unskilled jobs – election clerk, phone clerk, and surveillance system monitor.  (R.  51-52.)  At the time of the hearing, there were 19,000 clerical unskilled positions available in the state, and 14,150 security monitor positions available in the state. (R.  52.)

The ALJ also posed a third hypothetical question. *Id.* The ALJ asked Ms. Herren to consider an individual with the same conditions and limitations as mentioned in the second hypothetical with the same sedentary level, but now, because of exacerbations of pain, the individual would be absent from the workplace at unscheduled times and would be absent from work more than three days per month. *Id.* Ms. Herren testified that a person with these hypothetical limitations is not a candidate for competitive employment and that there was no work in the regional or national economy to accommodate this third hypothetical individual. *Id.*

In response to a question posed by Ms. Higgs' attorney, Ms. Herren further testified that, in competitive employment, an individual would be allowed only one 15-minute break in the morning, one-half hour break for lunch, and one 15-minute break in the afternoon. (R. 54.) She also testified that tolerated unscheduled absenteeism in competitive employment averages two days per month, but, for an individual with a semi-skilled job and a good communicative relationship with her employer, additional breaks and absences may be tolerated. (R. 54-56.)

## H.  The ALJ's Decision

To determine whether Ms. Higgs was disabled, the ALJ followed the five-step sequential process established by the Social Security Administration, outlined at 20 C.F.R. § 404.1520. At the first step of the analysis, the ALJ determined whether Ms. Higgs engaged in any substantial gainful activity since the alleged onset date of her disability, November 1, 2004. The ALJ determined that Ms. Higgs had not engaged in substantial gainful activity per 20 C.F.R. § 404.1520(b) since the alleged onset date of her disability.[2] (R. 12.)

---

[2] Disability is defined as "[t]he inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The second step in the sequential evaluation is to determine whether the claimant had a severe impairment, defined as a medically determinable impairment or combination of impairments that significantly limits the individual's physical or mental ability to meet the basic demands of work activity. 20 C.F.R. § 404.1520(c). The ALJ found that Ms. Higgs had the following severe impairments: "degenerative disc disease of the cervical spine; status post multiple cervical surgeries; myofasicial pain syndrome; right carpel tunnel syndrome; a dysthymic disorder; and a pain disorder associated with both psychological factors and a general medical condition." (R. 12.)

The third step in the analysis requires a comparison of the claimant's severe impairments with the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1, Listing of Impairments. (R. 12.) The ALJ concluded that Ms. Higgs' impairments, alone or in combination, did not meet the medical equivalent of severity for any of the listed impairments from the alleged on set date of November 1, 2004 to the present. (R. 12.) For the time period of November 2004 through December 2005, the ALJ found that Ms. Higgs' medical examinations showed that Ms. Higgs complained only of "tenderness, spasm, and trigger points in the upper back and neck, with no neurological deficits, coordination or gait abnormalities." (R. 12-13.) These symptoms accrued after her anterior discectomy and fusion in July 2004 and the posterior revision in February 2005. (R. 12-13.) The ALJ concluded that these symptoms were "inconsistent with impairments of listing level severity" found in Appendix 1. (R. 13.)

At the fourth step in the evaluative process, the ALJ must determine whether the claimant has a residual functional capacity ("RFC") that allowed her to perform her past relevant work, or any other jobs that exist in significant numbers in the national economy. (R. 14); 20 C.F.R. § 404.1565. In evaluating Ms. Higgs' RFC, the ALJ considered the entire record, including Ms.

Higgs' testimony and subjective complaints and, in accordance with 20 C.F.R. § 404.1529(c), evaluated her credibility. The ALJ considered the medical record, Ms. Higgs' daily activities, and her current medications. (R. 14-16.)

For the time period of November 1, 2004 through December 31, 2005, the ALJ concluded that Ms. Higgs had the following RFC: she could "perform sedentary work except with no work involving heights, ladders or scaffolds, no over the shoulder work, no reaching, pushing or pulling beyond arms length, only occasional bending, stooping, crouching, crawling, twisting, or climbing, no repetitive neck rotation, and no more than semi-skilled work tasks due to pain." (R. 14.) Based on Ms. Higgs' RFC prior to January 1, 2006, the ALJ determined that she was unable to perform her past relevant work as a retail sales clerk and sales representative because it required external and internal demands in excess of Ms. Higgs' RFC. (R. 17.)

For the time period of January 1, 2006 to the present, the ALJ concluded that Ms. Higgs had the following RFC: she could "perform unskilled sedentary work except that she would require work absences for four days per month or more due to pain and depressive symptoms." (R. 16.) Based on Ms. Higgs' RFC from January 1, 2006 to the present, the ALJ determined that she was still unable to perform her past relevant work as a sales clerk and sales representative. (R. 17-19.)

If the claimant is found unable to perform her past relevant work, in the fifth and final step in the sequential evaluation, the ALJ must determine whether the claimant can perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(g). For the time period from November 1, 2004 through December 31, 2005, the ALJ considered the testimony of the vocational expert as well as Ms. Higgs' age, education, and work experience. The ALJ determined that Ms. Higgs could perform a range of sedentary jobs, including information

clerk, travel clerk, elections clerk, phone clerk, and surveillance system monitor. (R. 18.) The ALJ thus concluded that Ms. Higgs "was capable of making a successful adjustment to work that existed in significant numbers in the national economy," and was, therefore, not disabled within the meaning of the Social Security Act before January 1, 2006. *Id.*

For the time period from January 1, 2006 to the present, the ALJ again considered the testimony of the vocational expert as to whether jobs exist in the national economy for an individual with Ms. Higgs' age, education and work experience, who could perform only sedentary work with the additional limitation of exacerbations of pain that would absent her from the work place at unscheduled times and who would be absent from work more than three days a month. (R. 18, 52.) The ALJ determined that additional limitations were present on January 1, 2006 that differed from Ms. Higgs' limitations prior to January 1, 2006. This determination was based on the factual finding that "the record indicate[d] that[,] in 2006, the claimant's pain became more severe." (R. 16-17.) The ALJ found Ms. Higgs' "allegations regarding her symptoms and limitations" in 2006 to be "generally credible" and supported by medical records that limited her to part-time sedentary work with frequent breaks and absences because of increased pain. (R. 17, 487-89, 607-08.) The ALJ also concluded that the additional limitations were supported by evidence that degenerative changes were taking place above Ms. Higgs' last fusion in December 2005. (R. 17, 553-54.) Ms. Higgs underwent additional therapy and also "experienced more severe mental symptoms in 2006, such that she sought treatment from a mental health professional, and was diagnosed with a pain disorder and a dysthymic disorder . . . and started on antidepressant medication." (R. 17; *see* 553-54.) The ALJ accepted the vocational expert's testimony that there were no jobs in the national economy that Ms. Higgs could perform. (R. 18-19.) Thus, the ALJ concluded that beginning on January 1, 2006

and continuing through the present, Ms. Higgs was disabled within the meaning of the Social Security Act. (R. 19.)

### III. STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998); *Gallus v. Callahan*, 117 F.3d 1061, 1063 (8th Cir. 1997); *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220 (1938)). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. *See Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999); *see also Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989) (citing *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. *See Roberts v. Apfel*, 222 F.3d 466, 468 (8th Cir. 2000); *see also Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996). "As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome . . . or because we would have decided the case differently. *Roberts v. Apfel*, 222 F.3d at 468 (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the

Commissioner's conclusion." *Id.* Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. *See Flynn v. Chater*, 107 F.3d 617, 620 (8th Cir. 1997); *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996). The Court must "defer heavily to the findings and conclusions of the SSA." *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

## IV. CONCLUSIONS OF LAW

This Court's determination of whether the ALJ properly concluded that Ms. Higgs was not entitled to Social Security Disability benefits before January 1, 2006, requires substantial evidence to support each step of the five-part sequential analysis detailed above. 20 C.F.R. § 404.1520. The ALJ found that, throughout the entire period of alleged disability (November 1, 2004 to the present), Ms. Higgs had not engaged in any substantial gainful activity, she suffered from severe impairments that did not meet or equal the impairments listed in Appendix 1, and she did not have the requisite RFC to perform past relevant work. (R. 12-19.) At the fourth step of the sequential analysis however, the ALJ found that Ms. Higgs did have the requisite RFC to perform other, less physically demanding, work in the national economy until January 1, 2006, and was therefore not disabled before that date. *Id.*

The issue on appeal is whether Ms. Higgs is entitled to disability benefits for the period of November 1, 2004 to December 31, 2005. The ALJ's decision at the fourth and fifth steps of the analysis forms the basis for the parties' cross-motions for summary judgment. After a review of the entire record, this Court concludes that the ALJ's findings at each step of the sequential analysis were supported by substantial evidence in the record as a whole. Therefore, Ms. Higgs is not entitled to Social Security Disability benefits prior to January 1, 2006.

**A. Applicable Law**

Disability is defined as "the inability to do *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) (emphasis added). In making a disability determination, the ALJ must analyze a sequential evaluation process which applies to both physical and mental disorders. Title 20, Section 404.1520 of the Code of Federal Regulations outlines the five-step sequential process used by the ALJ to determine whether a claimant is disabled. 20 C.F.R. § 404.1520.

The disability determination requires a step-by-step analysis. *See* 20 C.F.R.§ 404.1520(a). At the first step, the ALJ must consider the claimant's work history. 20 C.F.R. § 404.1520(a)(4)(i). At the second step, the ALJ must consider the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). At the third step, the ALJ must consider whether the claimant has an impairment or impairments that meet or equal one of the listings in Appendix 1 to Subpart P of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairment does not meet or equal one of the listings in Appendix 1, then the ALJ must make an assessment of the claimant's RFC and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant can still perform his or her past relevant work, the ALJ will find that the claimant is not disabled. If the claimant cannot perform his or her past relevant work, then the "burden shifts to the Commissioner to prove, first, that the claimant retains the [RFC] to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy." *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000).

**B. The ALJ Properly Evaluated the Pre-2006 Medical Evidence in the Record.**

23

### 1. The ALJ Properly Considered Dr. Agre's Report of December 6, 2006.

Ms. Higgs argues that the ALJ failed to address a statement in Dr. Agre's report, dated December 6, 2006, which states that Ms. Higgs' "pain levels have been consistent over the last 24-36 months." (ECF No. 7 at 28-29; R. 603.)

Generally, a treating physician's opinion is entitled to substantial weight. 20 C.F.R. § 404.1527(d)(2). If it is found "that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). On the contrary, the opinion of a treating physician based solely on the plaintiff's complaints is entitled to little weight. *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993) (acknowledging that a doctor's conclusion of disability resting solely on plaintiff's subjective complaints of pain is subject to little weight).

Here, the specific statement at issue is entirely Ms. Higgs' subjective account of her pain level. Additionally, the opinions of other treating physicians and many of Ms. Higgs' own statements in the record conflict with Dr. Agre's report. Also notably, Dr. Agre did not begin treating Ms. Higgs until August 2005; thus, any pain experienced by Ms. Higgs 24 to 36 months prior to the date of the report (December 6, 2006), occurred before Ms. Higgs' first visit with Dr. Agre and is outside the scope of his treatment.

Because the statement contained in Dr. Agre's report recounting Ms. Higgs' pain history is entirely subjective and relates to a period outside the time frame of Dr. Agre's treatment of Ms. Higgs, the ALJ did not improperly afford it little weight.

### 2. The ALJ Properly Considered Ms. Higgs' Medical Records in Light of the Vocational Expert's Testimony.

Ms. Higgs argues that other medical records show that she was totally disabled from November 1, 2004 through December 31, 2005. She asserts that the ALJ failed to consider that she would have missed a portion of the work day for up to 48 days within the time period between November 1, 2004 and December 31, 2005 because of scheduled medical appointments that would require employer permission.

The record as a whole must be considered, and evidence of doctors' appointments alone are not enough to support a claimant's argument in favor of a disability determination. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) ("The adjudicator must give full consideration to all of the evidence presented . . . ."); *see also Camano v. Astrue*, 2010 WL 629844, at *6 (E.D. Va. Feb. 19, 2010) (holding that absences consisting only of doctors' appointments and surgeries is a factor that suggests high residual functional capacity).

The ALJ did not explicitly analyze the effect of potential absences (as a result of the anticipated frequency of Ms. Higgs doctors' appointments) on Ms. Higgs' ability to perform work in the national economy. Still, Ms. Higgs could drive a car (R. 378-79) and work from her home computer between November 1, 2004 and December 31, 2005. (R. 374-75.) She was reported as having no pain behaviors at all in January and February 2005. *Id.* In addition, the vocational expert articulated that more than two *unscheduled* absences per month might be problematic if the employee did not have a reasonable relationship with the employer for certain types of jobs (such as cashier or receptionist) where the work flow stops if the employee is not present. (R. 54-56.) Reasonably, *scheduled* absences may not be as problematic in any job if the employee has a reasonable relationship with the employer. *See id.* The vocational expert suggested that scheduled

absences and breaks[3] would more likely be tolerated in semi-skilled jobs where the employee works behind the scenes and the work processes are not affected by that person's absence from the workplace. *See id.*

Based on the vocational expert's testimony, the ALJ determined that, prior to 2006, Ms. Higgs could perform a range of sedentary jobs, including semi-skilled work as an information clerk or travel clerk, despite her physical limitations. (R. 18.) It would not be unreasonable for these potential employers to allow for scheduled, medical absences consistent with Ms. Higgs' treatment needs. Therefore, the ALJ did not improperly evaluate Ms. Higgs' ability to perform work in the national economy prior to January 1, 2006**.**

### C. The ALJ Gave Proper Consideration to Plaintiff's Subjective Claims of Impairment Prior to January 1, 2006.

Ms. Higgs also argues that the ALJ failed to provide appropriate weight to her subjective complaints of pain as reported to her various physicians and therapists prior to January 1, 2006.

The ALJ may not reject Ms. Higgs' claims of pain simply because they were not supported by objective medical evidence. *Miller v. Sullivan*, 953 F.2d 417, 421 (8th Cir. 1992). The ALJ's decision will be reversed only if Ms. Higgs' subjective complaints of pain both "lack support in the medical record" and are "inconsistent with the record as a whole." *Id.* (quoting *Brown v. Sullivan*, 902 F.2d 1292, 1294 (8th Cir. 1990)). A "claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment . . . [but] [t]he adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1321-22. In addition to the frequency and intensity

---

[3] Additionally, the medical record reviewed by the vocational expert in order to evaluate Ms. Higgs' need for unscheduled breaks during the work day was Dr. Agre's December 6, 2006 report, which (as discussed above) does not specifically address her medical condition in the years 2004 and 2005. (*See* R. 606.)

of the pain, other factors must be considered in evaluating subjective statements, such as prior work records and observations by third parties and physicians regarding disability, daily activities, dosage of medication and functional restrictions. *Id.* at 1322. "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* Moreover, a reviewing court must affirm the Social Security Commissioner's denial of disability benefits if, after reviewing the record, it finds it possible to draw two inconsistent conclusions from the evidence and one of those conclusions represents the Commissioner's findings. *Jones v. Astrue*, — F.3d —, 2010 WL 3396835, at *2 (8th Cir. 2010).

Her physicians' assessments, as well as Ms. Higgs' own statements, refute her argument that the ALJ failed to provide appropriate weight to her subjective complaints of pain. Dr. Kraker's Report of Workability recommended that Ms. Higgs be excused from work due to her pain, but went on to state that she would be able to return to work in February 2005. (R. 305.) Dr. Kraker later recommended that she not work for an additional two months, but advised that she could once again return to work in April 2005. (R. 304.) In February 2005, Dr. Kioski reported that Ms. Higgs exhibited no pain behaviors (R. 374-75.) And, in October 2005, Dr. Kioski would not support Ms. Higgs' claim for Social Security Disability; rather, Dr. Kioski urged Ms. Higgs to continue working. (R. 358-59.) Ms. Higgs acknowledged that she was able to embark on an out of town vacation in September 2005, which indicates her ability to travel and move about at that time. (R. 362-63.) Also, in September and October of 2005, Ms. Edwardson (nurse practitioner) reported that Ms. Higgs' "goal [in applying for Social Security Disability] is to be able to at least have some temporary income until she can figure out a job/career that would be acceptable for her and her underlying condition." (R. 367-68, 424-25.) These reports indicate that Ms. Higgs was well enough

27

to work in sedentary jobs in the national economy.  Therefore, Ms. Higgs' subjective complaints of severe pain and immobility prior to January 1, 2006 are inconsistent with the objective medical evidence, and it was not unreasonable for the ALJ to find her statements not credible.

Importantly, Social Security Disability is not awarded as temporary income while one looks for work, but only for those individuals who have an "*inability* to engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in *death* or which has lasted or can be expected to last for a *continuous period of not less than 12 months*."  42 U.S.C. § 423(d)(1)(A) (emphasis added).  In December 2005, Ms. Higgs stated that she intended to seek Social Security Disability to fill a gap in her income while she looked for work.  By her own admission, therefore, Ms. Higgs felt able to perform some type of vocation.  Furthermore, the ALJ insinuated that Ms. Higgs lacked the motivation to work because there was no evidence in the record that she actively sought less physically demanding work, but instead filed for disability as temporary income. (R. 16.)  These statements, in light of the record as a whole, raise some doubt as to Ms. Higgs' assertion that she was unable to work due to pain.  *See Ostronski v. Charter*, 94 F.3d 413, 419 (8th Cir. 1996).

Having considered all the relevant evidence, the ALJ determined that the record as a whole contradicted Ms. Higgs' subjective complaints of pain prior to January 1, 2006.  (R. 15-16.)  A review of the record supports a finding that, while Ms. Higgs likely suffered from pain symptoms in 2004-2005, it was not so consistently intense as to preclude her from performing *any* work in the national economy between November 1, 2004 and December 31, 2005.

### D.  The ALJ  Properly Calculated Ms. Higgs' RFC Prior to January 1, 2006.

Ms. Higgs claims that the change in the ALJ's determination of her RFC beginning on

January 1, 2006 is arbitrary. (*See* R.16; ECF No. 7.) The ALJ found that Ms. Higgs' RFC did not permit her to return to her past employment, but did enable her to obtain other work prevalent in significant numbers in the national economy prior to 2006, but not after. (R. 17-18.) This Court finds, after a review of the record, that the ALJ's determination of Ms. Higgs' RFC and ability to perform jobs present in the national economy prior to January 1, 2006 is supported by substantial evidence in the record.

The ALJ found that, prior to January 1, 2006, Ms. Higgs could perform sedentary work as defined in Title 20, Section 404.1567(a) of the Code of Federal Regulations, "except with no work involving heights, ladders, or scaffolds, no over the shoulder work, no reaching, pushing, or pulling beyond arm's length, only occasional bending, stooping, crouching, crawling, twisting, or climbing, no repetitive neck rotation, and no more than semi-skilled tasks due to pain." (R. 14.) To determine her RFC, the ALJ relied on the entire record, including all symptoms that could reasonably be accepted as consistent with the objective medical evidence. (R. 14-15; *see* 20 C.F.R. § 404.1529.) The ALJ also considered opinion evidence of an independent medical examiner, in accordance with the requirements of Title 20, Section 404.1527. (R. 16.) The ALJ based her determination of Ms. Higgs' RFC (prior to January 1, 2006) on the objective medical evidence as well as a variety of other factors, including an evaluation of the credibility of Ms. Higgs' statements regarding the intensity, persistence, and effects of her pain. (R. 14-15.)

Ms. Higgs relies primarily on her own subjective complaints of pain to support her argument that the ALJ improperly calculated her RFC. (ECF No. 7 at 26-27.) But it was not unreasonable for the ALJ to find Ms. Higgs' statements regarding the intensity, persistence, and the functionally limiting effects of her physical impairments to be not credible in light of the record as a whole. The

record shows that Ms. Higgs was employed through December 2004, driving through February 2005, and volunteering and using her computer through March 2007. (R. 26-30.) In August 2005, Dr. Helms reported that her range of shoulder motion was intact and that Ms. Higgs had full upper extremity strength. (R. 276-78.) In September 2005, Ms. Higgs had good motor strength and tone in the upper extremities. (R. 360-61.) In November 2005, she moved without pain at the shoulders, elbows, and wrists. (R. 443-44.) Furthermore, in his November 2005 report, her husband stated that she was able to do the laundry and could drive for short periods of time. (R. 136-38.) For these reasons, objective medical evidence and third party statements support the ALJ's findings with respect to Ms. Higgs' physical limitations.[4]

Unlike in 2004 and 2005, 2006 medical records consistently indicate that Ms. Higgs was disabled. On April 14, 2006, Dr. Agre reported that Ms. Higgs had "completed her current occupational therapy/Postual Restoration" because it had aggravated her pain considerably. (R. 490, 493.) Also, in his November 17, 2006 report, Dr. Agre stated that Ms. Higgs was permanently and totally disabled and could not participate in substantial competitive gainful employment. (R. 488-89.) Therefore, the ALJ's determination of Ms. Higgs' RFC and ability to work jobs present in the national economy prior to January 1, 2006 is supported by substantial evidence.

Ms. Higgs also contends that the first and second hypothetical posed to the vocational expert by the ALJ were improper because they did not accurately reflect Ms. Higgs' limitations for the period of November 1, 2004 through December 31, 2005. (ECF No. 7 at 38.) Ms. Higgs specifically argues that the ALJ erred by not accepting the vocational expert's responses to Ms.

_____

[4] The record also indicates that Ms. Higgs received no mental health treatment during 2005. Ms. Higgs' is reported to have had only mild depression due to pain symptoms in 2005 (not treated with anti-depressants), which is also consistent with the ALJ's determination of her 2004-2005 RFC. (R. 33, 257.)

Higgs' attorney's questions regarding her limitations as set forth in Dr. Agre's 2006 report.[5] (*Id.*; R. 53-54.)

For the reasons discussed above, it was not improper for the ALJ to discount Ms. Higgs' subjective complaints of pain for the past 24 to 36 months as memorialized in this report. The ALJ determined that Ms. Higgs was disabled as of January 1, 2006. (R. 19.) Thus, medical evidence regarding Ms. Higgs' impairments after January 1, 2006 is not at issue here. This Court finds that the ALJ's hypothetical questions did not improperly characterize Ms. Higgs' impairments prior to January 1, 2006.

In conclusion, because the ALJ's determination is supported by substantial evidence in the record as a whole, the Commissioner's decision to deny Ms. Higgs' claim for disability benefits prior to January 1, 2006 should be affirmed.

## V.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Plaintiff's Motion for Summary Judgment (ECF No. 6) be **DENIED**;

2.   Defendant's Motion for Summary Judgment (ECF No. 9) be **GRANTED**;

3.   The Commissioner's decision be **AFFIRMED** and the case **DISMISSED WITH PREJUDICE**; and

4.   **JUDGMENT BE ENTERED ACCORDINGLY.**

---

[5] Dr. Agre's report of December 6, 2006 states that Ms. Higgs was incapable of even low stress jobs; that she would be able to sit, stand or walk for less than two hours; and that she would require more than four absences per month. (R. 603-08.)At the hearing, Ms. Higgs' attorney asked the vocational expert if competitive employment would allow for unscheduled breaks every 15 to 30 minutes throughout the work day, to which the vocational expert replied that it would not. (R. 53-54.)

DATED: December 23, 2010          *S/ Franklin L. Noel*

                                         FRANKLIN L. NOEL

                                 United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 6, 2011**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.